**CASE NO. 24-10335**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

SWEET ADDITIONS INGREDIENT PROCESSORS, LLC,

*Plaintiff-Appellant*

vs.

MEELUNIE AMERICA, INC.,

*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 9:21-CV-81141-AHS

**PLAINTIFF-APPELLANT'S
INITIAL BRIEF**

**MAURO LAW P.A.**
C. Cory Mauro
Florida Bar No. 384739
cory@maurolawfirm.com
1001 Yamato Road, Suite 401
Boca Raton, Florida 33431
Tel: (561) 202-1992

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In compliance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3, Plaintiff-Appellant certifies that the following represents a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal:

1. Ken Valdivia, principal of Appellant, Sweet Additions, Ingredient Processors, LLC;

2. David Abbeg, principal of Meelunie America, Inc.;

3. Cory Mauro, counsel for Appellant;

4. Mauro Law, P.A., counsel for Appellee;

5. John A. Hubbard, counsel for Appellee;

6. Eric A. Parzianello, counsel for Appellee;

7. Zane M. Thompson, counsel for Appellee;

8. Mauro, Cory, *counsel for Appellee*;

9. Hubbard Snitchler & Parianello PLC, counsel for Appellee; and

10.     Honorable Raag Singhal, U.S. District Court Judge.

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiff-Appellant hereby certifies that it is a nongovernmental corporation, and that there is neither a parent corporation nor is there any publicly held corporation that owns 10% or more of its stock.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff-Appellant believes that oral argument will materially assist this Court in resolving the issues involved in this appeal. The outcome of this appeal depends on an in-depth analysis of Florida and Michigan law, and the application of that law to the nuanced circumstances of this case. In important respects, this is a matter of first impression for this Court. Therefore, Plaintiff-Appellant is of the opinion that this Court would benefit from hearing directly from counsel regarding their respective positions and reasoning at oral argument, and of having the opportunity to ask questions of counsel to clarify and refine the Court's evaluation of these important issues.

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CIP ........................ C-1

STATEMENT REGARDING ORAL ARGUMENT ............................... i

TABLE OF CONTENTS........................................................ ii

TABLE OF CITATIONS .................................................... ivv

JURISDICTIONAL STATEMENT ........................................... x

STATEMENT OF THE ISSUES PRESENTED................................... 1

STATEMENT OF THE CASE................................................ 1

    A. Nature of the Case and Introduction.......................... 1

    B. Statement of the Facts. ..................................... 3

    C. Course of Proceedings Below. ................................ 9

    D. Standards of Review.......................................... 14

SUMMARY OF THE ARGUMENT .......................................... 14

ARGUMENT .............................................................. 16

    I. THE DISTRICT COURT ERRED IN DETERMINING ON
       SUMMARY JUDGMENT THAT THE TERMS AND
       CONDITIONS HAD BEEN INCORPORATED BY REFERENCE
       INTO THE SUPPLY CONTRACT. ................................... 16

    II. THE DISTRICT COURT ERRED IN RULING THAT SAIP'S
       DIRECT COVER DAMAGES WERE EXCLUDED UNDER
       THE TERMS AND CONDITIONS AND THAT SUCH
       EXCLUSION DID NOT IMPERMISSIBLY LEAVE SAIP
       WITHOUT A REMEDY....................................... 29

           A. The Terms and Conditions cannot be interpreted to exclude
             SAIP's direct cover damages…………………………… 30

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

      B. Even if SAIP's direct cover damages are deemed to have been excluded, this exclusion cannot be enforced where SAIP has been left with no remedy for Meelunie's breach……………..38

CONCLUSION ........................................................................................49

CERTIFICATE OF COMPLIANCE.........................................................50

CERTIFICATE OF SERVICE ................................................................51

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

# TABLE OF CITATIONS

## Cases

*Affinity Internet, Inc. v. Consol. Credit Counseling Servs.*,
  920 So. 2d 1286 (Fla. 4th DCA 2006)............................................ 20, 21, 25, 26

*Ally Fin., Inc. v. State Treasurer*,
  918 N.W.2d 662 (Mich. 2018).................................................................35

*Atl. Cas. Ins. Co. v. Gustafson*,
  891 N.W.2d 499 (Mich. 2016).................................................................35

*Aureal, Inc. v. I/O Magic Corp. (In re Aureal, Inc.)*,
  279 B.R. 573 (Bankr. N.D. Cal. 2002) ....................................................44

*Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*,
  953 F.3d 707 (11th Cir. 2020) ..................................................................x

*Bacon v. Avis Budget Grp., Inc.*,
  357 F. Supp. 3d 401 (D.N.J. 2018)..........................................................23

*Bacon v. Avis Budget Grp., Inc.*,
  959 F.3d 590 (3d Cir. 2020) ....................................................................24

*BGT Grp., Inc. v. Tradewinds Engine Servs., LLC*,
  62 So. 3d 1192 (Fla. 4th DCA 2011)............................... 17, 19, 20, 23, 24, 25, 26

*BOC Grp., Inc. v. Chevron Chem. Co., LLC*,
  819 A.2d 431 (N.J. Super. Ct. App. Div. 2003) .....................................44

*Calderon v. Sixt Rent a Car, LLC*,
  2020 U.S. Dist. LEXIS 24247 (S.D. Fla. Feb. 12, 2020) ......................24

*Callisto Corp. v. Inter-State Studio & Publ'g Co.*,
  2006 U.S. Dist. LEXIS 31004 (D. Mass. May 4, 2006).........................37

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

*Chemetron Corp. v. McLouth Steel Corp.*,
381 F. Supp. 245 (N.D. Ill. 1974) ........................................................................33

*Cole Energy Dev. Co. v. Ingersoll-Rand Co.*,
8 F.3d 607 (7th Cir. 1993) ...................................................................................48

*Cont'l AFA Dispensing Co. v. AFA Polytek (In re Indesco Int'l, Inc.)*,
451 B.R. 274 (Bankr. S.D.N.Y. 2011) ........................................................... 36, 37

*Decoration Design Sols., Inc. v. Amcor Rigid Plastics USA, Inc.*,
2021 U.S. Dist. LEXIS 239159 (E.D. Mich. Dec. 14, 2021) ...............................48

*Dental Health Prods., Inc. v. Sunshine Cleaning Gen. Servs.*,
2023 U.S. Dist. LEXIS 29019 (E.D. Wis. Feb. 22, 2023)....................................43

*Dependable Component Supply Corp. v. Lear Corp.*,
2007 U.S. Dist. LEXIS 104761 (S.D. Fla. Feb. 20, 2007) ...................... 21, 22, 25

*El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*,
383 S.W.3d 138 (Tex. 2012) ................................................................................33

*Elorac, Inc. v. Sanofi-Aventis Can., Inc.*,
343 F. Supp. 3d 789 (N.D. Ill. 2018)....................................................................37

*Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*,
328 F. Supp. 2d 1319 (S.D. Fla. 2004)..................................................................18

*Fantis v. Flywheel Sports, Inc.*,
2019 U.S. Dist. LEXIS 39589 (S.D. Fla. Mar. 11, 2019) ....................................26

*Fantis v. Flywheel Sports, Inc.*,
2019 U.S. Dist. LEXIS 89183 (S.D. Fla. Apr. 29, 2019)......................................26

*Foam Supplies, Inc. v. Dow Chem. Co.*,
2008 U.S. Dist. LEXIS 58801 (E.D. Mo. Aug. 4, 2008).....................................43

*Gemini Ins. Co. v. Castro*,
    723 F. App'x 797 (11th Cir. 2018) .......................................................14

*Gustavsson v. Wash. Mut. Bank, F.A.*,
    850 So. 2d 570 (Fla. 4th DCA 2003) ...................................... 19, 22, 25

*Harvey v. Lifespace Cmtys., Inc.*,
    306 So. 3d 1248 (Fla. 5th DCA 2020) ........................................ 18, 19

*Kaye v. Macari Bldg. & Design, Inc.*,
    967 So. 2d 1112 (Fla. 4th DCA 2007) ................................................22

*Kelynack v. Yamaha Motor Corp.*,
    394 N.W.2d 17 (Mich. Ct. App. 1986) ...............................................42

*Klapp v. United Ins. Grp. Ag., Inc.*,
    663 N.W.2d 447 (Mich. 2003) .................................................... 31, 38

*Latimer v. William Mueller & Son, Inc.*,
    386 N.W.2d 618 (Mich. Ct. App. 1986) ................................. 41, 42, 48

*M&G Polymers USA, LLC v. Tackett*,
    574 U.S. 427 (2015) ............................................................................47

*Mead Corp. v. McNally-Pittsburgh Mfg. Corp.*,
    654 F.2d 1197 (6th Cir. 1981) ...........................................................31

*Mgmt. Comput. Controls, Inc. v. Charles Perry Constr., Inc.*,
    743 So. 2d 627 (Fla. 1st DCA 1999) .................................................25

*Newman v. Roland Mach. Co.*,
    2010 U.S. Dist. LEXIS 155104 (W.D. Mich. May 13, 2010) .............42

*Nielsen Co. (US), LLC v. Success Sys.*,
    112 F. Supp. 3d 83 (S.D.N.Y. 2015) ......................................... 31, 37

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

*OBS Co. v. Pace Constr. Corp.*,
    558 So. 2d 404 (Fla. 1990) ...............................................................17

*Progressive Care, Inc. v. Keycentrix, LLC*,
    2022 U.S. Dist. LEXIS 200628, (S.D. Fla. Nov. 3, 2022) ...................26

*River Rouge Sch. Dist. v. Mestek, Inc.*,
    2002 Mich. App. LEXIS 1231 (Ct. App. Aug. 20, 2002) ...................48

*Rosenberg v. Lawrence*,
    541 So. 2d 1204 (Fla. 3d DCA 1988)..................................................48

*Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*,
    525 F.3d 409 (6th Cir. 2008) ..............................................................31

*S. Minn. Beet Sugar Coop. v. Agri Sys.*,
    427 F. Supp. 3d 1026 (D. Minn. 2019)...............................................33

*Solo v. UPS Co.*,
    819 F.3d 788 (6th Cir. 2016) ..............................................................37

*Spicer v. Tenet Fla. Physician Servs., LLC*,
    149 So. 3d 163 (Fla. 4th DCA 2014)........................................... 24, 26

*Temple Emanu-El v. Tremarco Indus.*,
    705 So. 2d 983 (Fla. 4th DCA 1998)...................................................19

*Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*,
    48 F.4th 1298 (11th Cir. 2022) ...........................................................14

*Wilkie v. Auto-Owners Ins. Co.*,
    664 N.W.2d 776 (Mich. 2003)............................................................34

*Winn-Dixie Stores, Inc. v. Big Lots Stores, Inc.*,
    2016 U.S. Dist. LEXIS 65508 (S.D. Fla. May 16, 2016)....................24

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

*Yates v. United States*,
  574 U.S. 528 (2015).............................................................................35

*Young v. New Process Steel, LP*,
  419 F.3d 1201 (11th Cir. 2005)...........................................................14

**Statutes**

28 U.S.C. § 1291...................................................................................x

28 U.S.C. § 1332...................................................................................x

Mich. Comp. Laws § 440.1305.............................................................33

Mich. Comp. Laws § 440.2106.............................................................46

Mich. Comp. Laws § 440.2711.............................................................32

Mich. Comp. Laws § 440.2712.............................................................32

Mich. Comp. Laws § 440.2715.............................................................32

Mich. Comp. Laws § 440.2717...............................................................9

*Mich. Comp. Laws § 440.2719.................................. 33, 39, 40, 41, 42, 45

**Other Authorities**

17A Am. Jur. 2d *Contracts* § 603........................................................47

17B C.J.S. *Contracts* § 448 (1999)......................................................47

MAURO LAW | 1001 YAMATO ROAD, SUITE 401 | BOCA RATON, FLORIDA 33431 | 561.202.1992 | WWW.MAUROLAWFIRM.com

## Rules

FRAP 4.................................................................................................................................x

FRCP 59.............................................................................................................................x

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy exceeded $75,000,00. (DE 1 at p. 1). In response to the Court's February 27, 2024 directive, the parties jointly filed a statement on March 6, 2024, clarifying that no member of Plaintiff-Appellant or its parent company are residents of Michigan, confirming diversity with Defendant-Appellee, a Michigan corporation.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 as it is from a final order of the district court. (DE 154-155, 163, 166). Jurisdiction extends to all previous interlocutory orders that produced the final judgment, including the district court's partial summary judgment against Plaintiff-Appellant. (DE 121). *See Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 725 (11th Cir. 2020).

The final judgment was entered by the district court on October 31, 2023. (DE 154). Plaintiff-Appellant timely filed a post-judgment motion pursuant to Rule 59 of the Federal Rules of Civil Procedure on November 27, 2024. (DE 156). The district court entered its order denying Plaintiff-Appellant's post-judgment motion on January 3, 2024. (DE 163). Plaintiff-Appellant filed its timely notice of appeal on January 31, 2024, pursuant to Rule 4 of the Federal Rules of Appellate Procedure. (DE 167).

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

## STATEMENT OF THE ISSUES PRESENTED

The two issues presented to this Court for determination are:

1.     Whether a contract has incorporated into it by reference a collateral document that was not attached or provided with the contract at the time of execution and there is evidence of a lack of intent to be bound by the party against whom the collateral document is sought to be applied.

2.     Whether a seller in a fixed price supply contract that has failed to ship the promised product can avoid liability by both excluding all of a buyer's monetary damages (both direct and consequential) and providing a limited warranty that does not apply to undelivered product, thereby leaving a buyer with no remedy.

## STATEMENT OF THE CASE

### A.     Nature of the Case and Introduction.

This case involves a fixed price supply contract under which Defendant/Appellee Meelunie America, Inc. ("Meelunie") agreed to supply Plaintiff/Appellant Sweet Additions Ingredient Processors, LLC ("SAIP") with organic tapioca starch. SAIP sued Meelunie when it fell millions of pounds short of the starch it agreed to supply. Meelunie counterclaimed to recover on unpaid invoices for previous starch orders which were delivered and not contested by SAIP.

As a threshold matter, the parties disputed whether a collateral document containing boilerplate terms and conditions drafted by Meelunie had been

1

incorporated by reference into the parties' supply contract. Whether these terms and conditions were incorporated into the contract is determinative of the parties' duties, rights, defenses and remedies. Thus, whether the terms and condition were incorporated by reference was a prominent subject of the parties' competing summary judgment motions. The district court ruled in favor of Meelunie and, finding that the collateral document was incorporated by reference into the supply contract under Florida law.

The parties proceeded to a bench trial, after which the district court confirmed that Meelunie on its counterclaim was entitled to recover just under $1 million in unpaid invoices for delivered starch, plus interest, the liability for and amount of which SAIP never disputed. At trial, SAIP sought to recover its direct cover damages from Meelunie of approximately $1.65 million, which would have more than offset Meelunie's recovery and produced a net final judgment in SAIP's favor. However, based on its interpretation of the terms and conditions, the district court held that SAIP was not entitled to any remedy against Meelunie for the undelivered starch.

On appeal, SAIP first seeks reversal of the district court's summary judgment determining that the collateral document had been incorporated by reference. Barring this relief, SAIP seeks reversal of the district court's final judgment precluding SAIP from recovering direct cover damages against Meelunie.

**B.      Statement of the Facts.**

SAIP sells sweeteners, which it manufactures from organic tapioca starch. (DE 132 at p. 8). On September 16, 2019, SAIP and Meelunie entered into a sales contract under which Meelunie agreed to supply SAIP with nearly 20 million pounds of organic tapioca starch in 2020 at a fixed price of 40.8 cents per pound, for a total contract price of $8,095,291 (the "Supply Contract"). (DE 155 at p. 2). At the time of its execution, the Supply Contract consisted of a single page containing pricing, quantity, shipment, delivery and payment details, and appeared as follows:



xxx
**meelunie**
EST.1867

Meelunie America Inc.
3000 Town Center, Suite 2237
Southfield, MI 48075, United States
tel +1 248 917 0200  info@meelunie.com
meelunie.com

Sweet Additions Ingredient Processors LLC
612 S 8th St.
Cameron, WI 54822
US

Southfield, 9/16/2019

**SALES CONTRACT SMA015193**
We herewith confirm having SOLD to you on our general conditions

PRODUCT      : Organic Tapioca starch, food grade, Windmill brand

QUANTITY     : 19,841,400 LB loaded in 360 FCL/40ft container(s) of 55,115 LB

PACKING      : 40x25kg bags, Windmill brand net, Pallets

PRICE        : USD 40.80 Per 100 LB , including packing

DELIVERY     : DDP MINNEAPOLIS MN US - DIRECT, (Incoterms 2010)

SHIPMENT     : January 2020 - December 2020

PAYMENT      : Check, 45 days net from date of Invoice

REMARKS      : Seller will cover Customs and Clearance prior to arrival.- The customer is
               responsible for the accessorial costs if the containers are not returned within
               the allotted time period. Number of free days are to be determined and
               Sweet Additions will be notified prior to arrival.

Yours sincerely,
MEELUNIE AMERICA INC.

Sweet Additions Ingredient Processor   Todd Watts        David Abbeg
                                        by Erik Rath      by Erik Rath

Please send all Purchase Orders to orders@meelunie.com.

Global Supplier Of Agricultural Ingredients

On all our Sales contracts, our General Sales conditions apply. A copy of these conditions can be obtained upon request.

(DE 1-1). No other document was executed by the parties, and it is undisputed that Meelunie did not include any other materials or documents when it sent the Supply Contract to SAIP in September of 2019. (DE 87 & 96 at ¶ 15).

Meelunie delivered about 14.8 million pounds of tapioca starch from 2020 through early 2021, but later failed to deliver the amounts due. (DE 155 at p. 2).[1] The first failure occurred in the first quarter of 2020, consisting of a shortfall of approximately 1.3 million pounds. (DE 155 at p. 3). SAIP lost about $450,000 in February of 2020 due to Meelunie's non-delivery, crippling SAIP's ability to satisfy its own customers' orders. (*Id.*). Then, again, in January of 2021, Meelunie notified SAIP that it could not deliver product and that the problem would likely last until the middle of the year. (*Id.* at p. 4). Shortly thereafter, Meelunie advised that it could not ship starch for the entire second half of the year. (*Id.* at pp. 4-5).

In response, SAIP entered the organic tapioca starch market directly and contracted with a tapioca starch manufacturer, Ubon Sunflower Company, Ltd., ("Ubon"), for replacement product to meet its own customers' demands. (*Id.* at p. 5). Meelunie's total shortfall under the Supply Contract was over five million

---

[1] While the Supply Contract included a set amount of starch to be delivered by Meelunie to SAIP in 2020, in practice, the parties' contracts would carry over into the following year if there was a balance remaining to be delivered. (DE 171 at p. 87; DE 155 at 5, fn. 4). In fact, deliveries under the Supply Contract did not begin until mid-February of 2020 because the starch delivered in January to mid-February of 2020 was delivered under the previous 2019 contract. (DE 155 at p. 2, fn. 3).

4

pounds, which amount SAIP purchased from Ubon at the then-prevailing market price of 73.6 cents per pound, 32.8 cents per pound higher than the Supply Contract price. (*Id.*). As a result, by covering the shortfall on the open market SAIP spent $1,650,100.76 more than it would have had Meelunie performed. (*Id.*). On March 29, 2021, SAIP declared a material breach by Meelunie for failing to supply organic tapioca starch in accordance with the Supply Contract. (*Id.*).

Starting in February of 2019, separate and apart from the Supply Contract, the parties entered into an arrangement whereby Meelunie extended a $1 million credit line to SAIP, which represented the total amount of outstanding amounts due at any one time that Meelunie would allow SAIP's accounts receivable to reach – a practice that is industry standard. (*Id.* at p. 5). Thus, for any given new shipment, Meelunie would inform SAIP how much it needed to pay to stay under the $1 million threshold, SAIP would wire the required amount, and Meelunie would then make the delivery. (*Id.*). In other words, starting in 2019 and continuing until the end of their business relationship in 2021, SAIP's balance due to Meelunie hovered just under this $1 million level, by the parties' agreement. (*Id.* at pp. 3-4).

However, in May of 2021, after Meelunie declared that it was unable to perform under the Supply Contract, Meelunie nonetheless abandoned the parties' agreement and demanded that SAIP pay the ***entire balance*** of past due invoices which (unsurprisingly) totaled a little under $1 million. (*Id.* at p. 5). This was not

only contrary to the arrangement under which the parties had traveled for many months, (*id.* at p. 4), but Meelunie also demanded 18% interest on the balance, seeking total reimbursement of well over $1 million but still less than the $1.65 million extra SAIP had paid for replacement product. (*Id.* at p. 5).

Meelunie had been charging SAIP interest on its carried balance since 2019. (*Id.* at p. 4). While the Supply Contract stated that payments were due by SAIP within 45 days of each invoice, it was silent on the topic of interest. (DE 1-1). In late April of 2019, while the parties were operating under the sales contract for 2019, Meelunie sent an email to Ken Valdivia, SAIP's president and CEO, and Deborah Higgs, SAIP's controller and head of accounting, warning that Meelunie would soon start charging interest on past due invoices pursuant to its "sales terms and conditions," which it attached to the email. (DE 85-3 at p. 6; DE 93-9) (hereinafter, the "Terms and Conditions"). Starting in mid-2019 and continuing into 2020, Meelunie would from time to time email Higgs and/or her accounting assistant, Samatha Swiderski (with a copy to Valdivia), with interest invoices which attached the Terms and Conditions. (DE 85-3 at p. 6; DE 93-11; 93-16). These are the only times Meelunie sent the Terms and Conditions to Valdivia.

There is no indication in the body of these emails that the Terms and Conditions were incorporated into the Supply Contract, which post-dates the emails by months. (DE 93-9; 93-11). Rather, the emails narrowly pertain to interest on

Meelunie's carried balance. (*Id.*). While Valdivia was copied on these email chains, as CEO he delegated accounting and invoicing tasks to Higgs and therefore never saw the attached Terms and Conditions himself. (DE 171 at pp. 115-16). On various other occasions from 2019 through 2021, Meelunie sent SAIP's accounting department invoices and attached the Terms and Conditions behind the invoice, but made no reference to them in the body of the emails. (DE 85-07; DE 87-11). Neither Valdivia nor any other member of SAIP's senior management received these emails. (*Id.*).

Meelunie never referenced the Terms and Conditions in the routine conversations between it and Valdivia; the first time Valdivia actually saw the Terms and Conditions was after this lawsuit commenced. (DE 171 at pp. 115-16). There is no dispute that Meelunie never supplied the Terms and Conditions together with its supply contracts with SAIP throughout their years-long relationship, nor with the 2020 Supply Contract at issue in this case. (DE 87 at p. 3, ¶ 17; DE 89 at p. 2, ¶ 8; DE 93 at p. 2, ¶ 8). Neither Meelunie's Director of Finance (David Abbeg) nor Meelunie's sales manager responsible for SAIP's account (Joe Steckel) could recall ever seeing the Terms and Conditions actually attached to the parties' supply contracts. (DE 96 at p. 6, ¶ 29; DE 103 at p. 6, ¶ 29). Indeed, during Meelunie's failures to deliver product in 2020 and 2021, Meelunie never invoked the Terms and Conditions in extensive discussion with SAIP and Valdivia. (DE 171 at pp. 115-16).

The Terms and Conditions consist of a single page. (DE 87-06). They were drafted by Meelunie, and contain material typos, syntax errors, missing phrases, and provisions which, on their face, do not apply to the supply of a raw material product like organic tapioca starch. (*Id.*). They provide:

- "**PRICES AND TERMS**. All prices by Meelunie America are subject to change without notice." ¶ 1.

- "**DELIVERY**. Shipping dates given in advance of actual shipment are estimates and shall not be deemed to represent fixed or guaranteed shipping dates. Meelunie shall not be liable for failure to deliver or for delay in delivery or performance due to … a cause beyond its reasonable control …, insolvency of other inability to perform by the manufacturer, delay in transportation, or … any other commercial impracticability." ¶ 2.

- "**WARRANTIES**. Goods sold by Meelunie America are the products of a reputable manufacturer and are in accordance with the manufacturer's warranty … or customary practice, [sic] the repair or replacement of goods that may prove defective in material or workmanship. The foregoing shall constitute the exclusive remedy of the Buyer and the sole obligation of Meelunie America." ¶ 4.

- "**LIMITATION OF LIABILITY**. Meelunie America's liability on any claim for loss or damage arising out of this contract or from the performance or breach thereof or connected with the supplying of any goods hereunder …, whether based on contract, warranty, tort (including negligence) or other grounds, shall not exceed the price allowable to such goods or part thereof involved in the claim…. Meelunie America shall not in any event be liable, whether as a result of breach of contract, warranty, tort (including negligence) or other grounds, for special consequential [sic], incidental, or exemplary damages including, but not limited to, loss of profits or revenue, loss of use of the product or any associated product, cost of capital, cost of substitute products, facilities or service, downtime costs, or claims of customers of Buyer for such damages." ¶ 5.

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

- "**TERMINATION**. Buyer may terminate an order only by mutual agreement based upon payment to Meelunie America of reasonable and proper termination charges." ¶ 6.

- "**INTERPRETATION OF CONTRACT**. This contract shall be construed according to the law of, and under the Uniform Commercial Code adopted by, the State of Michigan. Except as otherwise expressly stated in this agreement, all terms and conditions herein shall have the same definitions as set forth in the Uniform Commercial Code as adopted by the State of Michigan." ¶ 10.

(*Id.*).

## C. Course of Proceedings Below.

SAIP sued Meelunie for breach of contract to recover damages caused by Meelunie's failure to deliver millions of pounds of product under the Supply Contract. (DE 1). SAIP attached the one-page Supply Contract to its complaint, which SAIP understood to be the entirety of the parties' agreement. (DE 1-1). In response, Meelunie filed an answer and affirmative defenses (DE 8) and a counterclaim (which it amended) (DE 18) seeking recovery for unpaid invoices for delivered starch (which SAIP never disputed).[2] Several of Meelunie's affirmative defenses and its amended counterclaim expressly relied on the Terms and Conditions, which it alleged were "incorporated by reference into the parties'

---

[2] SAIP exercised its statutory right to withhold payment in anticipation of a future offset. *See* MCL § 440.2717 ("The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.").

agreements," attaching it to the amended counterclaim as if executed along with the sales contracts. (DE 8 at pp. 5-6; DE 18-1).

The parties filed competing motions for summary judgment regarding SAIP's complaint, Meelunie's affirmative defenses, and Meelunie's amended counterclaim. (*see generally* DE 84-89, 92-97, 102-106). Among the key issues addressed by these summary judgment motions was whether the Terms and Conditions were incorporated by reference into the Supply Contract. (*Id.*). This issue was determinative of what law governed the parties' contractual dispute, and defined the parties' duties, rights, defenses and remedies.

For the most part, the district court denied each sides' summary judgment motions. However, the district court concluded that the Terms and Conditions had been incorporated into the Supply Contract, noting that it was a "close call." (DE 121 at pp. 1, 6-7). At around the same time, Meelunie filed a motion to exclude SAIP from testifying about lost profit damages. (DE 100). Meelunie argued that the Terms and Conditions precluded consequential damages, including lost profit damages, noting that the Terms and Conditions provide that it "shall not be liable for loss of profits or revenue or consequential damages." (*Id.* at pp. 5, 13). Acknowledging that some measure of damages for SAIP was required if lost profits were excluded, Meelunie observed that SAIP obtained starch from "other suppliers," and conceded that "by obtaining [p]roduct from other suppliers, ***SAIP covered pursuant to the***

**[Supply] Contract which is another possible appropriate measure of damages**." (*Id.* at p. 5, fn. 2) (emphasis added).[3] Simply put, Meelunie conceded in its filing that SAIP was entitled to cover damages.

The district court excluded SAIP's lost profits witness on other grounds, but held that Valdivia "will be permitted to testify about SAIP's lost profits, assuming a proper foundation can be made." (DE 120 at p. 7). However, the district court removed lost profits entirely upon granting summary judgment, incorporating the Terms and Conditions by reference. The district court held that "SAIP's employees may testify to whatever damages may be recovered under the terms of the parties' contract," appearing, like Meelunie, to acknowledge that SAIP was entitled to some remedy under the Supply Contract and the incorporated Terms and Conditions. (DE 121 at p. 10).

SAIP proceeded to bench trial on its breach of contract claim seeking its direct damages only in the form of cover costs. Although less than what SAIP might have recovered on a lost profits theory, this cover amount still exceeded the undisputed total of SAIP's unpaid invoices (plus interest) that served as the basis of Meelunie's counterclaim. At the two-day bench trial, Valdivia testified for SAIP while Abbeg and Steckel testified for Meelunie, and the parties agreed to the admission of numerous exhibits. (DE 139; DE 171-72). At the close of SAIP's case, Meelunie

---

[3] All emphasis herein has been provided by counsel unless otherwise stated.

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

argued for the first time that it was entitled to judgment on the basis that the Terms and Conditions, in addition to barring consequential damages like lost profits, also precluded SAIP from recovering its direct damages in the form of cover. (DE 172 at pp. 38-39). The district court reserved ruling on that motion. (*Id.* at p. 46).

On October 31, 2023, the district court entered its Findings of Fact and Conclusions of Law (the "Findings"). (DE 155). It granted Meelunie's motion for judgment on partial findings on the issue of damages, determining that direct cover damages were excluded by the Terms and Conditions and Michigan's Uniform Commercial Code (hereinafter, the "Michigan UCC"). (*Id.* at pp. 6-10). The district court concluded that the phrase "cost of substitute products" in paragraph five of the Terms and Conditions meant "cover damages," that such cover damages were listed among the types of consequential damages which SAIP was excluded from recovering, and that it was not unjust to bar SAIP from obtaining any remedy at all for Meelunie's material breach because the Terms and Conditions were not unconscionable. (*Id.*).

Having ruled that SAIP was not entitled to any recoverable damages, the district court found it unnecessary to address any of the other elements or defenses to SAIP's breach of contract claim and ruled in Meelunie's favor. (*Id.*). The district court also concluded that SAIP was liable for the unpaid invoices (plus interest) on

Meelunie's amended counterclaim. (*Id.* at pp. 10-11). It then entered a final judgment to this effect in favor of Meelunie. (DE 154).

SAIP moved to alter and amend the judgment and for a new trial, arguing that Michigan law requires that parties to sales contracts have some remedy available to them, and that as interpreted and applied by Meelunie and the district court the Terms and Conditions deprived SAIP of any benefit of the bargain, causing the contract to fail of its essential purpose. (DE 156). Meelunie opposed the motion, arguing that SAIP had a remedy: the warranty provision under paragraph 4 of the Terms and Conditions which permitted SAIP to seek "repair and replacement" of the starch. (DE 158). SAIP replied that this purported "remedy" did not apply to undelivered product, as occurred here, and so therefore the warranty did not save the contract (as interpreted by the district court) from its fundamental failure to afford SAIP at least some modicum of actual relief. (DE 160). On January 3, 2024, the district court denied SAIP's motion, finding that the Terms and Conditions still afforded SAIP the "remedy" of the "right to cancel its contract with Meelunie and to seek goods elsewhere," which it determined was sufficient to permit enforcement of its total exclusion of other forms of relief. (DE 163). According to the district court, SAIP's right to terminate the Supply Contract due to Meelunie's failure to deliver goods was

the sole remedy available to SAIP, and adequate to avoid a finding that the Supply Contract was illusory. (*Id.*). This timely appeal followed. (DE 167).

## D.     Standards of Review.

This Court reviews "a district court's rulings on motions for summary judgment *de novo*." *Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*, 48 F.4th 1298, 1301 (11th Cir. 2022). Because the issue of whether the Terms and Conditions were incorporated by reference into the Supply Contract was determined below based on undisputed facts, this is a pure issue of law that is reviewed by this Court *de novo*. *See Young v. New Process Steel, LP*, 419 F.3d 1201, 1203 (11th Cir. 2005). Finally, this Court must likewise review *de novo* the district court's interpretation of the Terms and Conditions and its application of Michigan law to exclude SAIP's direct cover damages as a matter of law. *See Gemini Ins. Co. v. Castro*, 723 F. App'x 797, 800 (11th Cir. 2018) ("Questions of contract interpretation are pure questions of law reviewed de novo…. Moreover, we conduct de novo review of a district court's interpretation of state law.").

## <u>SUMMARY OF THE ARGUMENT</u>

At the summary judgment stage, the district court erred when it determined that SAIP intended for the Terms and Conditions to become part of the Supply Contract. For an unexecuted collateral document to be deemed part of a contract, forceful and conspicuous language of incorporation must be present, the contract

must specifically identify and describe the collateral document, and the collateral document must be delivered near the time of execution. Here, the only language of incorporation in the Supply Contract is miniscule and equivocal, the Terms and Conditions were not identified or described, the Terms and Conditions were never provided to SAIP together with the Supply Contract (or any other contract between the parties), and SAIP was never directly informed by Meelunie that the Terms and Conditions applied to the Supply Contract until this litigation had already commenced. This is insufficient to permit the Terms and Conditions to be incorporated by reference, and the district court's ruling should be reversed.

Second, the district court erred by interpreting the Terms and Conditions to exclude SAIP's recovery of direct cover damages from Meelunie, leaving SAIP without any remedy for Meelunie's failure to supply millions of pounds of starch under the Supply Contract. Initially, the limitation of liability provision of the Terms and Conditions cannot reasonably be interpreted to exclude cover damages, and doing so runs contrary to both the Michigan UCC and basic canons of contract interpretation. Moreover, even if the district court's construction stands, the Michigan UCC invalidates agreements that rob a contracting party of all benefit of the bargain such that the contract fails of its essential purpose. That is what happened here. The district court's ruling renders the Supply Contract illusory, providing SAIP

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

with no remedy for Meelunie's breach. For the reasons that follow, the district court should be reversed.

## **ARGUMENT**

### I.  **THE DISTRICT COURT ERRED IN DETERMINING ON SUMMARY JUDGMENT THAT THE TERMS AND CONDITIONS HAD BEEN INCORPORATED BY REFERENCE INTO THE SUPPLY CONTRACT.**

At the time the parties executed the Supply Contract, it consisted of a single page and did not include the Terms and Conditions. Meelunie withheld the Terms and Conditions from SAIP when negotiating and executing the Supply Contract, and omitted to mention to SAIP that the Terms and Conditions applied to the Supply Contract or that they eviscerated SAIP's remedies for breach. Meelunie did not inform SAIP of the Terms and Conditions proximate to execution of the Supply Contract. Under Florida law, the Terms and Conditions were therefore not incorporated into the Supply Contract, and the district court erred in determining otherwise. Accordingly, this Court should reverse and remand for further proceedings under the Supply Contract, without the Terms and Conditions.

It is undisputed that when the parties negotiated and executed the one-page Supply Contract, Meelunie did not send SAIP the Terms and Conditions. (DE 93 at ¶ 5 Meelunie admits that "[t]he Parties entered into ***a one-page*** Sales Contract") (emphasis added); (DE 87 at ¶ 17) (admitting that Meelunie "did not attach a copy of the Terms and Conditions to the Sales Contract when Meelunie sent it to SAIP").

Meelunie admits that neither party acknowledged the oblique, passing references in small print to the Terms and Conditions when they negotiated and executed the Supply Contract. (DE 89 at ¶ 8; DE 93 at ¶ 8). On these facts, the default rule in Florida is that the contract to which the parties agreed to be bound consists **_only_** of the one-page Supply Contract (DE 1-1), and it was incumbent on Meelunie to demonstrate otherwise.

"It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *OBS Co. v. Pace Constr. Corp.*, 558 So. 2d 404, 406 (Fla. 1990). "To incorporate by reference a collateral document, the incorporating document must (1) specifically provide that it is subject to the incorporated collateral document and (2) the collateral document to be incorporated must be sufficiently described or referred to in the incorporating agreement so that the intent of the parties may be ascertained." *BGT Grp., Inc. v. Tradewinds Engine Servs., LLC*, 62 So. 3d 1192, 1194 (Fla. 4th DCA 2011) (citations omitted).

Here, neither requirement was met. The passing references to general conditions in miniscule type in the Supply Contract do not "specifically provide" that it was "subject to" the Terms and Conditions, which were not "sufficiently described" therein such that SAIP's intent to be bound can be inferred. The key

guidepost in applying this doctrine is whether the parties ***intended and agreed*** to be bound by the collateral document. In other words, "Florida courts require explicit language stating that the parties intend to be bound by the terms of a collateral document in order for the parties to be bound by that document." *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 328 F. Supp. 2d 1319, 1333 (S.D. Fla. 2004).

Where a collateral document is not physically executed or attached to the contract (as here), the analysis is guided by subjective proxies for intent, like the strength, prominence and detail of the incorporating language in the main contract and whether the collateral document (although unexecuted and unattached) was provided at or around the time the main contract was executed. When these secondary indices of agreement are unconvincing, intent to be bound by the missing document cannot be inferred. Thus, to successfully incorporate by reference a collateral document, mere reference to it is not enough. *See Harvey v. Lifespace Cmtys., Inc.*, 306 So. 3d 1248, 1251 (Fla. 5th DCA 2020) ("[M]ere reference to another document is insufficient to incorporate" by reference).

Instead, courts in Florida require more compelling evidence of intent to be bound, such as emphasized disclaimers that unmistakably alert both parties that the contract is "subject to" the collateral document, a specific description of the collateral document, the provision of the collateral document at the time of execution

of the contract, and ideally all three. *See id.* (incorporation is less compelling "where the incorporating document makes no specific reference that it is 'subject to' the collateral document"); *Gustavsson v. Wash. Mut. Bank, F.A.*, 850 So. 2d 570, 573 (Fla. 4th DCA 2003) (incorporation will rarely be granted where the terms and conditions sought to be incorporated are not at the very least set out "in another document supplied to the other party at the time of the making of the contract"); *Temple Emanu-El v. Tremarco Indus.*, 705 So. 2d 983, 984 (Fla. 4th DCA 1998) ("A mere reference to another document is not sufficient to incorporate that other document into a contract, particularly where the incorporating document makes no specific reference that it is 'subject to' the collateral document."). Here, none of these indicia of intent exist such that it would be fair to conclude that SAIP clearly intended them to govern the parties' contractual relationship.

The Fourth District Court of Appeal's decision in *BGT Group* is instructive. There, the seller provided a quote to the buyer that formed the parties' contract. "In the 'REMARKS' section, toward the bottom of the quote, was this language: 'ALL QUOTATIONS, INVOICES AND ORDERS ARE SUBJECT TO THE ATTACHED BGT TERMS AND CONDITIONS.' No terms and conditions were attached to the quote." *Id.* at 1193. Like this case, the Terms and Conditions were not attached to the contract. But unlike here, the contract in *BGT Group* had a disclaimer in all caps stating that the contact was "SUBJECT TO" the terms and

conditions. The court found the all-caps disclaimer insufficient to incorporate the

collateral document:

> The quote and purchase order in this case did not sufficiently describe the "terms and conditions," so it cannot objectively be said that Tradewinds agreed to be bound by them. Additionally, BGT failed to provide the terms and conditions during the negotiating process; thus, the sales contract was formed without Tradewinds ever having seen them. The "terms and conditions" were not provided until a contract dispute had arisen. A reasonable view of this "contract" is that BGT, as the drafter of the documents, did not intend to incorporate any "terms and conditions" where it did not provide a specific description of them or attach them to the quote and purchase order.

*Id.* at 1195. Similarly, here, SAIP cannot be said to have agreed to the incorporation

of unspecified terms that were not presented or described at the time of execution.

Had Meelunie intended the Terms and Conditions to apply, it would have made sure

to deliver them with the Supply Contract and alerted SAIP to their application during

the parties' relationship. The fact that Meelunie did not do so demonstrates the

absence of intent to incorporate.

In another directly applicable decision, in *Affinity Internet, Inc. v.*

*Consolidated Credit Counseling Services*, 920 So. 2d 1286 (Fla. 4th DCA 2006), the

contract between the parties stated: "This contract is subject to all of SkyNetWEB's

terms, conditions, user and acceptable use policies located at" a specific hyperlink.

*Id.* at 1287. The court held that "the contract contains no clear language evidencing

an intention of the parties to incorporate the terms of the collateral document." *Id.* at

1288. Noting that "the collateral document [was] not attached to the contract," the

court concluded that "[w]hen a contract refers to another document, ***it must not only expressly refer to the document, but it must also sufficiently describe the document***." *Id.* at 1288-89. Simply referencing the phrase "terms and conditions" was inadequate. The court continued: "While the contract in this case does state that it is subject to the collateral document, that simple statement, with nothing more, is insufficient to bind [the opposing party]." *Id.* at 1288. Meelunie's case for incorporation by reference is materially less compelling than that of *Affinity Internet*, where the agreement stated the contract was "subject to" the collateral document and provided a specific website where the collateral document was but a click away.

Finally, in *Dependable Component Supply Corp. v. Lear Corp.*, 2007 U.S. Dist. LEXIS 104761 (S.D. Fla. Feb. 20, 2007), the court analyzed a purchase order that stated: "EFFECTIVE SEPTEMBER 1, 2002, LEAR CORPORATION HAS CHANGED ITS TERMS AND CONDITIONS THAT APPLY TO THIS PURCHASE ORDER. THESE TERMS AND CONDITIONS MAY BE ACCESSED VIA THE INTERNET AT 'WWW.LEAR.COM.'" *Id.* at *3. Like our facts, the statement in *Dependable* merely states that the additional terms "apply to" the contract; unlike our facts, this statement was in all caps instead of small and hidden type. The Southern District held that such language was not enough to incorporate the collateral terms by reference where the opposing party was not actually provided with the collateral document. It observed that "[m]ere reference to

21

another document is insufficient to incorporate that other document into a contract, particularly where the incorporating document makes no specific reference that it is 'subject to' the collateral agreement." *Id.* at *20 (citation omitted).

The court then cited favorably to *Affinity Internet*, stating "the provision relied upon by Lear herein was located at the corporate website, and was neither provided to Plaintiff, nor signed by Plaintiff," and "just as in *Affinity*, while the phrase contained on the Lear purchase order expressly refers to other terms and conditions that are located at the website, the reference to the website fails to describe any of the terms and conditions found at the website." *Id.* at *25-26. Finally, it held that "[w]hile the language employed by Defendant on the purchase order may evidence a *general* intent by the parties to be bound by the additional terms found at the website, the fact remains that Defendant failed to *specifically* refer to and *describe* the additional terms to be incorporated," and that the terms "were neither specifically described … nor ever actually provided to Plaintiff." *Id.* at *27-29 (emphasis in original); *see also Kaye v. Macari Bldg. & Design, Inc.*, 967 So. 2d 1112, 1113-14 (Fla. 4th DCA 2007) ("A mere reference to another document is not sufficient to incorporate that other document into a contract, particularly where the incorporating document makes no specific reference that it is 'subject to' the collateral document."); *Gustavsson*, 850 So. 2d at 573-74 ("[T]he existence of conspicuous

terms providing for other terms elsewhere is not all that is required to make such other terms binding. The terms must actually be provided.").

In addition to the shortcomings described above, the Supply Contract also falls far short of "sufficiently describing or referring to" the collateral document. While the collateral document is titled "Terms and Conditions," the Supply Contract (in small print) references a document variously called Meelunie's "general conditions" or its "General Sales conditions." (DE 1-1; DE 87-6). The difference is significant, because the collateral document must be sufficiently identified to put the contracting parties on notice as to exactly what is being incorporated. But Meelunie's Supply Contract does not even contain the correct title of the alleged collateral document. This undermines any intent to incorporate. For example, in *Bacon v. Avis Budget Group, Inc.*, 357 F. Supp. 3d 401 (D.N.J. 2018), the court, applying Florida law and citing to *BGT Group*, rejected incorporation by reference based on, among other things, the "critical" factor that the contract referred to the collateral document as a "Rental Jacket" when it was actually called "Rental Terms and Conditions." *Id.* at 424-25. As a result, the "specific description" element was absent where the collateral document "did not actually bear the title 'Rental Jacket.'" *Id.* at 425.

The Third Circuit upheld this interpretation of Florida law, affirming that the collateral document was "not 'sufficiently described' to meet Florida's requirement

to be deemed incorporated into the [contract] … [where] the rental jacket is labelled 'Rental Terms and Conditions' rather than 'rental jacket.'" *Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 601 (3d Cir. 2020); *see also Calderon v. Sixt Rent a Car, LLC*, 2020 U.S. Dist. LEXIS 24247, at *16 (S.D. Fla. Feb. 12, 2020) (holding that a mere "cursory reference" to a collateral document, "on its own, cannot be a 'sufficient description or reference'" to that document); *Winn-Dixie Stores, Inc. v. Big Lots Stores, Inc.*, 2016 U.S. Dist. LEXIS 65508, at *17 (S.D. Fla. May 16, 2016) (rejecting incorporation where the main contract "did not even name the [collateral] document" with specificity); *Gomez Packaging Corp. v. Smith Terminal Warehouse Co.*, 2011 U.S. Dist. LEXIS 165628, at *25-26 (S.D. Fla. Sep. 12, 2011) (rejecting incorporation because "mere language indicating the potential existence of the Terms and Conditions, without more, did not put [the plaintiff] on notice of their content"); *Spicer v. Tenet Fla. Physician Servs., LLC*, 149 So. 3d 163, 168 (Fla. 4th DCA 2014) (rejecting incorporation where the collateral document "was not sufficiently described in the employment agreement"); *BGT Group*, 62 So. 3d at 1194-95 (rejecting incorporation where contract did not sufficiently describe the "terms and conditions").

By contrast, in addition to actual delivery of the collateral document, cases finding incorporation by reference involve forceful and conspicuous incorporating language and a specific description of the collateral document, a far cry from

Meelunie's small-type reference to the wrong title. *Cf. Mgmt. Comput. Controls, Inc. v. Charles Perry Constr., Inc.*, 743 So. 2d 627, 631-32 (Fla. 1st DCA 1999) (collateral document was specifically incorporated "as though fully set forth" and was actually delivered to the opposing party with software boxes "sealed with an orange sticker" warning that [b]y opening this packet, you indicate your acceptance of the … license agreement."). Such circumstances do not exist here, and the much more analogous holdings in *BGT Group*, *Affinity Internet* and *Dependable* dictate that the Terms and Conditions were not incorporated by reference.

Had Meelunie wished to incorporate the Terms and Conditions into the Supply Contract, it needed to do more than obliquely reference its "general sales conditions" in small print as "applying" to that contract without identifying the actual Terms and Conditions or providing them to SAIP during negotiation or execution of the Supply Contract. As stated by the Fourth District in *Gustavsson*, this "is but another example that the offeror is still the master of the offer" and where Meelunie did not "expressly refer [to] and sufficiently describe" the Terms and Conditions, "it cannot now ask … to put in a term and condition when it failed to do so and to which [SAIP] did not assent." 850 So. 2d at 574. While the Supply Contract states that a "copy of these conditions can be obtained upon request," such statements are not enough to allow for incorporation in the absence of other clear indications of intent to incorporate, which are lacking here. *See, e.g.*, *Affinity*, 920

So. 2d at 1287 (rejecting incorporation despite the provision of an exact website link where the terms and conditions could be found); *Fantis v. Flywheel Sports, Inc.*, 2019 U.S. Dist. LEXIS 39589, at *26 (S.D. Fla. Mar. 11, 2019) ("Florida law requires … the collateral document [to be] … sufficiently described in the contract or … a copy of the collateral document [to be] provided" to the contracting party), *report and recommendation adopted* 2019 U.S. Dist. LEXIS 89183 (S.D. Fla. Apr. 29, 2019) (citing favorably to *BGT Group* and *Affinity Internet*).

The district court in its summary judgment order noted that the Terms and Conditions had been sent to SAIP as an attachment to invoicing emails, taking the position that SAIP was therefore aware of the Terms and Conditions. (DE 121 at p. 7). However, it is undisputed that the Terms and Conditions were not given to SAIP ***near the time*** this Supply Contract (or indeed any previous contract) was signed. *See Spicer*, 149 So. 3d at 167 (an "important fact" arguing against incorporation by reference is if the party advocating incorporation "failed to provide the terms and conditions during the negotiating process"); *Progressive Care, Inc. v. Keycentrix, LLC*, 2022 U.S. Dist. LEXIS 200628, at *6 (S.D. Fla. Nov. 3, 2022) (citing *Spicer*, and noting that incorporation is generally unwarranted where "the collateral document was not provided to the plaintiff at the time the plaintiff executed the contract").

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

Meelunie also never alerted SAIP that the Terms and Conditions modified and applied to the Supply Contract in particular. Instead, the only context in which the Terms and Conditions were raised by Meelunie were in accounting emails that pertained not to the Supply Contract, but instead to invoices and interest charges. These emails were sent to SAIP's accounting department seeking payment on invoices, and not negotiating terms with SAIP's decision makers. Neither SAIP's CEO (Valdivia) nor any other senior officer of SAIP saw the Terms and Conditions prior to this litigation, and Meelunie never spoke about them with Valdivia during the parties' phone conversations relating to Meelunie's delayed and failed deliveries in 2020 and 2021. For such a document to be integrated into the parties' agreement, it was incumbent on Meelunie not to hide the Terms and Conditions as it did, but instead actually draw attention to them by either physically attaching them to the Supply Contract or using conspicuous and forceful language of description and incorporation. The district court erroneously found incorporation occurred by Meelunie including the collateral document as an unremarkable attachment to collection emails meant for the accounting department, months in time removed from the actual execution of the Supply Contract. This is inadequate to ascribe any intent to be bound by SAIP.

The district court also placed significance on the fact that the Terms and Conditions were mentioned in passing twice, and not just once, in the Supply

Contract. (DE 155 at pp. 6-7). Indeed, the district court was unimpressed with the very small print at the bottom of the Supply Contract stating that on Meelunie's sales contracts the "General Sales conditions apply" and that a copy "can be obtained upon request," observing that had this been the only language of incorporation then "SAIP would undoubtedly prevail." (*Id.* at p. 6). Critically, the district court necessarily determined that the language at the top of the Supply Contract was outcome-determinative: "We herewith confirm having SOLD to you on our general conditions…." (*Id.* at p. 7). However, this language (like that at the bottom of the Supply Contract) was in a very small font size, and was not bolded, italicized, capitalized, or otherwise emphasized in any way. (DE 1-1). Also, this inconspicuous introductory language misidentified the name of the collateral document, did not specifically describe any term or condition, and was entirely devoid of the kind of definitive language that Florida courts require before incorporation by reference is found, such as "subject to," "are part of," "take precedence over," and "as though fully set forth," which all better indicate an intent to be bound. *See generally supra*.

In the context of a body of Florida law that infers intent from the language and circumstances of incorporation, the references to the Terms and Conditions in the Supply Contract is simply too hidden, too unobtrusive, and too indefinite to demonstrate SAIP's "clear intent," particularly where the failure to provide the collateral document upon execution of the contract required ***even more*** forceful and

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

noticeable language of incorporation than would otherwise be necessary. Here, there was both a failure to provide the Terms and Condition at the time of execution of the Supply Contract, and a complete lack of prominent and definitive language of incorporation in the collateral document. The district court therefore erred in finding that Florida law required the Terms and Conditions to be incorporated by reference into the Supply Contract, and its ruling on summary judgment must be reversed.

## II. THE DISTRICT COURT ERRED IN RULING THAT SAIP'S DIRECT COVER DAMAGES WERE EXCLUDED UNDER THE TERMS AND CONDITIONS AND THAT SUCH EXCLUSION DID NOT IMPERMISSIBLY LEAVE SAIP WITHOUT A REMEDY.

This Court should reverse the district court's ruling that the Terms and Conditions were incorporated by reference into the Supply Contract, as set out above in Section I. If it does, this Court need proceed no further. Alternatively, this Court should find that, following the bench trial, the district court erred in one of two ways. First, the lower court erred in interpreting the Terms and Conditions to exclude SAIP's direct cover damages. The district court compounded its initial error by allowing the remedies exclusion to stand even though this left SAIP without a

remedy. The outcome produced by these combined errors runs contrary to core principles of contract interpretation, Michigan law, and the UCC.

A. **The Terms and Conditions cannot be interpreted to exclude SAIP's direct cover damages.**

Following trial, the district court ruled that the limitation of liability provision of the Terms and Conditions excluded SAIP's right to recover its direct cover damages, expanding upon its earlier summary judgment ruling barring recovery of consequential damages. (DE 155 at pp. 6-9). Having left SAIP without any recoverable damages, the district court granted judgment against SAIP on its complaint without addressing any other elements of SAIP's breach of contract claim or Meelunie's defenses. (*Id.*). The district court's conclusion that direct damages such as cover were excluded by the Terms and Conditions is erroneous as a matter of contract interpretation and Michigan law, and should be reversed.

The limitation of liability clause of the Terms and Conditions states in relevant part as follows:

> **LIMITATION OF LIABILITY**. Meelunie America's liability on any claim for loss or damage arising out of this contract or from the performance or breach thereof or connected with the supplying of any goods hereunder …, whether based on contract, warranty, tort (including negligence) or other grounds, ***shall not exceed the price allowable to such goods or part thereof involved in the claim***…. Meelunie America shall not in any event be liable, whether as a result of breach of contract, warranty, tort (including negligence) or other grounds, for ***special consequential [sic], incidental, or exemplary damages including, but not limited to***, loss of profits or revenue, loss of use of the product or any associated product, cost of capital, ***cost of***

> **substitute products**, facilities or service, downtime costs, or claims of customers of Buyer for such damages.

(DE 87-06 at ¶ 5). At the outset, this provision of the Terms and Conditions (along with several others) is poorly drafted, plagued by typos and syntax errors. These boilerplate terms were drafted by Meelunie, and any ambiguities are of Meelunie's own creation and must be interpreted against it. *See Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 423 (6th Cir. 2008); *Klapp v. United Ins. Grp. Ag., Inc.*, 663 N.W.2d 447, 454-55 (Mich. 2003).

The district court determined that SAIP's cover damages were encompassed by the phrase "cost of substitute products," and therefore among the types of damages that could not be recovered from Meelunie. (DE 155 at p. 10). However, this interpretation ignores the balance of the limitation of liability paragraph and violates basic principles of contract interpretation. First, it cannot be disputed that "cover" damages are not "special, consequential, incidental or exemplary" damages, but are instead direct, non-consequential damages. *See Mead Corp. v. McNally-Pittsburgh Mfg. Corp.*, 654 F.2d 1197, 1210 n.19 (6th Cir. 1981) (holding that "damages falling within the concept of 'cover'" do not "come under the definition of consequential damages"); *accord Nielsen Co. (US), LLC v. Success Sys.*, 112 F. Supp. 3d 83, 103 (S.D.N.Y. 2015) (holding that "special, incidental, consequential, indirect, punitive or exemplary damages … clearly refer to damages beyond those flowing directly from the" contract in contrast to direct or "general damages").

31

The Terms and Conditions are required to be interpreted under Michigan's UCC, which also confirms that cover is distinct from and is not a form of incidental or consequential damage. When a seller fails to make delivery, a buyer is entitled to go to market and "cover" the undelivered product. MCL § 440.2711(1). Under the following section, the buyer "may recover from the seller as damages the difference between the *cost of cover* and the contract price *together with any incidental or consequential damages* as hereinafter defined (section 2715), but less expenses saved in consequence of the seller's breach." MCL § 440.2712(2). Thus, the Michigan UCC clearly distinguishes between "cost of cover" damages (on the one hand) and "incidental or consequential damages" (on the other hand). Likewise, "incidental damages" are defined to include (among other things) "expenses or commissions *in connection with effecting cover*," while consequential damages are defined to mean losses "resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and *which could not reasonably be prevented by cover* or otherwise." MCL § 440.2715.

The official comments to section 440.2715 state that "[a]ny seller who does not wish to take the risk of consequential damages has available the section on contractual limitation of remedy." MCL § 440.2715, cmt. 3. Notably, there are no similar provisions (or official comments) empowering a seller who does not wish to take the risk of cover damages or benefit of the bargain damages to craft a limitation

to that effect. Likewise, section 440.2719 states that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable," but includes no similar statement allowing cover damages or other forms of non-consequential damages to be so "limited or excluded." MCL § 440.2719(3); *see also S. Minn. Beet Sugar Coop. v. Agri Sys.*, 427 F. Supp. 3d 1026, 1031 (D. Minn. 2019); ("Here, the costs [buyer] seeks to recover are cover costs, not consequential damages."); *El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 144 (Tex. 2012) ("The UCC definition of consequential damages excludes cover.") (both interpreting the same UCC provisions as in Michigan). Moreover, while parties are free to limit recovery of damages, the UCC makes it clear that such provisions should be narrowly construed against the party seeking to enforce such limitations, since "[t]he remedies provided in this act must be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." MCL § 440.1305(1); *see also Chemetron Corp. v. McLouth Steel Corp.*, 381 F. Supp. 245, 250–51 (N.D. Ill. 1974), *aff'd*, 522 F.2d 469 (7th Cir. 1975) ("While parties may agree to limit the remedies for breach of their contract, the policy of the Uniform Commercial Code disfavors limitations and specifically provides for their deletion if they would act to deprive a contracting party of reasonable protection against breach.") (applying Michigan law and citing MCL § 440.2719).

In sum, Meelunie's Terms and Conditions incorrectly characterize cover damages as excludable consequential damages. But cover damages are not a form of consequential or incidental damages, and under the Michigan UCC the former cannot be contractually limited or excluded, though the latter can.[4] Despite this, the district court erroneously allowed SAIP's cover damages to be excluded as constituting "cost of substitute products," part of Meelunie's defined consequential damages. The Michigan UCC precludes the district court's interpretation. Further, the ruling runs afoul of several principles of contract interpretation.

The third sentence of the limitation of liability provision states that Meelunie is not liable for "special[,] consequential, incidental, or exemplary damages," and then purports to list a number of examples of such types of damages following the phrase "including but not limited to." (DE 87-06 at ¶ 5). Among the list of examples is the "cost of substitute products," which the district court interpreted to mean cover

---

[4] The district court cited a Michigan case purportedly standing for the proposition that "parties are generally free to agree to whatever they like [in a contract] and, in most circumstances, it is beyond the authority of the courts to interfere with the parties' agreement." *Wilkie v. Auto-Owners Ins. Co.,* 664 N.W.2d 776 (Mich. 2003). (DE 155 at 7-8). Context is important, however, as this case was not governed by the Michigan UCC, involved the terms of an insurance policy, and simply rejected as a general principle the concept of analyzing the parties' "reasonable expectations" when interpreting contracts, as opposed to simply applying the contract language as written. *Id.* at 787-88. Here, however, there are unambiguous UCC provisions that preclude a contract party's attempt to exclude direct and non-consequential damages. *Wilkie* simply does not apply to the facts of this case, and does not give Meelunie *carte blanche* to ignore the UCC's requirements and strip SAIP of all potential remedies.

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

damages. All of the other items on the list (lost profits, loss of use, downtime costs, etc.) are "true" consequential, incidental or special damages. If interpreted to mean cover damages (as occurred below), the **only** item of non-consequential damages on this list would be "cost of substitute products."

Meelunie cannot redefine basic tenets of Michigan damages law by classifying direct damages as consequential damages. Doing so here violates "the associated-words canon (*noscitur a sociis*)," under which a term "must be viewed in light of the words surrounding it." *Ally Fin., Inc. v. State Treasurer*, 918 N.W.2d 662, 670 n.31 (Mich. 2018) (citation omitted). The canon applies when words or phrases "are associated in a context suggesting that the words or phrases have something in common," and "they should be assigned a permissible meaning that makes them similar." *Id.*; *see also Yates v. United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of *noscitur a sociis* – a word is known by the company it keeps – to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words") (citation omitted). Thus, when several words "are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar," and the canon particularly holds that "words grouped in a list should be given related meanings." *Atl. Cas. Ins. Co. v. Gustafson*, 891 N.W.2d 499, 503 (Mich. 2016) (citation omitted).

Here, the limitation of liability broadly states that Meelunie shall not be liable for consequential damages, followed by a list of examples of consequential damages. The principle of *noscitur a sociis* requires that the phrase "cost of substitute products," like the other words around it, not be interpreted to mean any kind of direct damage like cover. Courts outside of Michigan have interpreted limitation of liability clauses similar to Meelunie's as not including direct damages, even when their wording suggests otherwise. For example, in *Continental AFA Dispensing Co. v. AFA Polytek (In re Indesco Int'l, Inc.)*, 451 B.R. 274 (Bankr. S.D.N.Y. 2011), the court noted that lost profits can constitute both direct damages and consequential damages, depending on the context. *See id.* at 316. The limitation of liability clause in that case excluded "lost profits," but the court ruled that those lost profits that were direct damages would still be recoverable notwithstanding this plain language, holding:

> [The limitation of liability clause] provides that the parties may not recover punitive, consequential, liquidated, incidental, or indirect damages, *including* lost profits. Under the doctrine of *noscituur a sociis*, "a word is known by the company it keeps." The word "including," which proceeds "lost profits," demonstrates that the lost profits prohibited … are those that are a subset of "punitive, consequential, liquidated, incidental, or indirect damages." In other words, "lost profits" are only precluded insofar as they fall within the broader categories of indirect or consequential damages. And subsequently, lost profit damages that are direct or general, and not within a subset of "punitive, consequential, liquidated, incidental, or indirect damages," can be recovered.

*Id.* (emphasis in original); *see also Elorac, Inc. v. Sanofi-Aventis Can., Inc.*, 343 F. Supp. 3d 789, 803-05 (N.D. Ill. 2018) (interpreting excluded "loss of profits" as limited to "damages other than those for the value of the promised performance"); *Nielsen*, 112 F. Supp. 3d at 103 (same); *Callisto Corp. v. Inter-State Studio & Publ'g Co.*, 2006 U.S. Dist. LEXIS 31004, at *7-8 (D. Mass. May 4, 2006) (interpreting direct damages in the form of loss of royalty revenue to fall outside excluded "lost profits" since to hold otherwise would lead to an "absurd result: it would have to be believed that [plaintiff] had voluntarily negotiated and signed an agreement that effectively precluded it from obtaining any form of meaningful damage remedy").

In addition, the first sentence of the limitation of liability provision militates against a finding that direct monetary damages are excluded. That sentence provides a cap on Meelunie's liability that "shall not exceed the price" for the goods that are the subject of the contract or any "part thereof involved in the claim." (DE 87-06 at ¶ 5). This sentence expressly contemplates that a buyer like SAIP has available to it at least some amount of monetary recovery. However, by interpreting the third sentence of this same provision to exclude direct cover damages, the district court has rendered the first sentence meaningless, robbing an aggrieved buyer of all ability to recover such monetary damages. This too is inconsistent with longstanding principles of contract interpretation. *See Solo v. UPS Co.*, 819 F.3d 788, 794 (6th Cir. 2016) ("Every word, phrase, and clause in a contract must be given effect, and

contract interpretation that would render any part of the contract surplusage or nugatory must be avoided."); *Klapp*, 663 N.W.2d at 453 ("[C]ourts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory.").

Tellingly, Meelunie itself conceded earlier in the litigation that SAIP is entitled to cover damages. At the summary judgment stage, when it was attempting to prevent SAIP from seeking consequential lost profits, Meelunie acknowledged that "by obtaining [p]roduct from other suppliers, *SAIP covered pursuant to the [Supply] Contract which is another possible appropriate measure of damages*." (DE 100 at p. 5, fn. 2). Its own argument reveals that Meelunie its Terms and Conditions allowed for direct cover damages. Only at trial did Meelunie change course and seek to exclude all damages. Meelunie's first position is the correct one, and the district court erred by interpreting the Terms and Conditions to prevent SAIP from seeking its direct cover damages.

**B.** **Even if SAIP's direct cover damages are deemed to have been excluded, this exclusion cannot be enforced where SAIP has been left with no remedy for Meelunie's breach.**

As argued above, the Terms and Conditions cannot be interpreted to allow the exclusion of SAIP's direct, non-consequential damages. However, even if this extreme interpretation by the district court is allowed to stand, SAIP is entitled to cover damages under the Michigan UCC notwithstanding the parties' agreement,

because otherwise SAIP is left without any remedy. If the Supply Contract did not afford SAIP any remedy for Meelunie's breach, it would be illusory and fail of its essential purpose. Michigan law flatly rejects such a one-sided outcome, and the district court's approval of this result must be rejected.

On this point, the district court's and Meelunie's legal positions have oscillated dramatically. In its initial Findings, the district court first stated that a contract can preclude a buyer from recovering *anything at all* for the seller's breach unless the contract is both procedurally and substantively unconscionable. (DE 155 at pp. 9-10). There being no proof of procedural unconscionability because the Supply Contract was between two sophisticated commercial entities, the district court prevented SAIP from recovering lost profits and cover damages, leaving it with no relief. (*Id.*).

This analysis is flawed because the Michigan UCC and case law distinguish between excluding consequential damages (on the one hand) and excluding direct damages like cover (on the other hand). As noted above, with respect to consequential damages *only*, a contract provision excluding such damages will be upheld "unless the limitation or exclusion is unconscionable." MCL § 440.2719(3). With respect to attempts to exclude all other types of damages besides consequential damages, however, where such "exclusive or limited remed[ies] … fail of [their] essential purpose, remedy may be had as provided in this act." MCL § 440.2719(2).

Thus, where exclusionary contract provisions go beyond excluding consequential damages, Michigan law appropriately casts a more skeptical eye on such clauses and will invalidate them if by their enforcement the contract "fails of its essential purpose."

The official comments are directly on point. While contracting parties are generally free to limit remedies, "***it is of the very essence of a sales contract that at least minimum adequate remedies be available***." MCL § 440.2719, cmt. 1. In other words, one party cannot craft contract language that leaves its contracting partner without recourse, since the parties "***must accept*** the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract." *Id.* (emphasis added). The comment then clarifies:

> Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. ***Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.***

*Id.* (emphasis added). The second sentence indicates that even where no unconscionability exists (*i.e.*, a contract clause is "apparently fair and reasonable"), a limitation of remedies clause must nevertheless "give way" to the general remedies of the Michigan UCC where it "fails of its essential purpose" or "deprives" a party "of the substantial benefit of the bargain." Thus, under the first sentence, a clause

excluding consequential damages is valid unless it is unconscionable under section 440.2719(3). But a clause excluding or limiting damages ***generally*** is invalid if it causes the contract as a whole to "fail of its essential purpose" or deprive a party "of the substantial benefit of the bargain" under section 440.2719(2). Contrary to the district court's ruling, unconscionability plays no role in the second analysis.

Cases in Michigan and in other states interpreting this identical UCC language have come to the same conclusion. For example, in *Latimer v. William Mueller & Son, Inc.*, 386 N.W.2d 618 (Mich. Ct. App. 1986), the Michigan Court of Appeals clearly delineated between these two independent tests when reviewing a contract's exclusive remedy clause, noting that "parties to a sales agreement may agree to limit remedies and damages," but that,

> [w]here circumstances cause a specified remedy to fail of its essential purpose, remedy may be had as provided elsewhere in the code. MCL 440.2719(2). … ***Moreover***, consequential damages may be limited or excluded unless an unconscionable result would be worked. MCL 440.2719(3).

*Id.* at 625. The *Latimer* court thus limited the unconscionability test to consequential damages, but noted that any attempt to limit non-consequential damages must also fail if the remedy "fail[s] of its essential purpose." It then held that the narrow remedies clause in the contract at issue was "an illusory one which represents no remedy at all in that it fails of its essential purpose." *Id.*

Two months later, the same court again held that while the Michigan UCC allows parties to limit damages, "subsection (2) further provides that, where the limited remedy fails in its purpose or operates to deprive either party of the value of the bargain, the parties may pursue other remedies provided elsewhere in the UCC." *Kelynack v. Yamaha Motor Corp.*, 394 N.W.2d 17, 19-20 (Mich. Ct. App. 1986). Citing to *Latimer* for this proposition, the *Kelynack* court then held that the limitation of liability clause in the sales contract before it provided the buyer with no real remedy, which meant that it "failed in its essential purpose and plaintiff was therefore entitled to pursue other remedies." *Id.* at 20.

More recently, a Michigan federal court, citing favorably to *Kelynack*, outlined the provisions of section 440.2719 and concluded that "a seller cannot put damage limiting language in a contract when that language would deprive the buyer of the benefit of the bargain." *Newman v. Roland Mach. Co.*, 2010 U.S. Dist. LEXIS 155104, at *4 (W.D. Mich. May 13, 2010). Similarly, a Missouri federal court applying Michigan law stressed how the unconscionability test applies only to consequential damages, not attempts to exclude direct damages:

> [Buyer's] final argument is that the limitation on liability clause "fails of its essential purpose." Michigan's UCC allows parties the normal right to modify or limit remedies for both parties. Mich. Comp. Laws § 440.2719. Limits on consequential damages are allowable so long as they are not unconscionable, § 440.2719(3), and [buyer] does not argue that this was an unconscionable contract. However, if "circumstances cause an exclusive or limited remedy to fail of its essential purpose," the limitation may be unavailable. § 440.2719(2). ***A limitation on***

> *liability clause fails of its essential purpose … where the limitation deprives either party of the value of the bargain*.

*Foam Supplies, Inc. v. Dow Chem. Co.*, 2008 U.S. Dist. LEXIS 58801, at *17-18 (E.D. Mo. Aug. 4, 2008) (applying Michigan law). The court in *Foam Supplies* rejected the buyer's argument that it was deprived of the benefit of the bargain, but *only because* "the normal remed[y] of cost of cover … still exist[ed]" for that buyer. *Id.* at *19. Here, however, the district court has held that not even cover damages may be recovered by SAIP, which surely would have caused the *Foam Supplies* court to invalidate the provision.

Cases from other states applying the identical UCC provision have reached the same outcome. A federal court in Wisconsin recently held that "[c]ontractual limitations of remedies are unenforceable where their enforcement would cause the contract to fail of its essential purpose," and *separately* with respect to consequential damages "[s]uch limitations are also unenforceable where enforcement would be unconscionable." *Dental Health Prods., Inc. v. Sunshine Cleaning Gen. Servs.*, 2023 U.S. Dist. LEXIS 29019, at *14 (E.D. Wis. Feb. 22, 2023). In *Dental Health*, the contract did not "fail of its essential purpose" *only because* the buyer remained able to recover "the direct damages it sustained, i.e., the difference in the market price at the time and place of delivery and the contract price." *Id.* at *14-15. Again, this is in great contrast to this case, where the district court has barred SAIP from even recovering this basic quantum of damages. *See also BOC Grp., Inc. v. Chevron*

*Chem. Co., LLC*, 819 A.2d 431, 438-39 (N.J. Super. Ct. App. Div. 2003) (observing that while "an arm's length contract between sophisticated commercial parties … should not be readily upset by a court, … where a party is deprived of the substantial value of its bargain…, the contract remedy will give way to the general remedy provisions of the U.C.C." and holding that, unlike here, the remedy limitation clause was valid because the buyer remained able to seek cover damages); *Aureal, Inc. v. I/O Magic Corp. (In re Aureal, Inc.)*, 279 B.R. 573, 583-84 (Bankr. N.D. Cal. 2002) (holding that under this UCC section there is a "bright line distinction … between consequential damages and other types of remedies," that consequential damages are "adjuncts to the primary remedies for breach of contract," that subsection (3) "only applies to 'consequential damages,'" and that because "cover" damages "are not consequential damages" they cannot be contracted away by limitation of liability clauses if this causes the contract to "fail of its essential purpose" and deprive a party of the benefit of the bargain).

Without the ability to recover its direct cover damages, the contract failed of its essential purpose and deprived SAIP of the benefit of its bargain. Therefore, the exclusion in this case cannot be enforced *regardless* of whether it was unconscionable. In opposition, Meelunie appeared to concede that *some* remedy needed to be provided to SAIP to uphold the Terms and Conditions, but pivoted to

argue that SAIP was afforded such a remedy under the warranty provision, which read:

> **WARRANTIES**. Goods sold by Meelunie America are the products of a reputable manufacturer and are in accordance with the manufacturer's warranty … or customary practice, [sic] the repair or replacement of goods that may prove defective in material or workmanship. The foregoing shall constitute the exclusive remedy of the Buyer and the sole obligation of Meelunie America.

(DE 87-06 at ¶ 4; DE 158 at pp. 9-14). However, this warranty provision is completely inapplicable to the facts of this case, which involves the non-delivery of goods, and not the delivery of defective goods. One cannot "repair" or "replace" what has not been delivered. If this case had involved delivered and defective goods, SAIP **might have** had some remedy for Meelunie's breach of contract (*i.e.*, replacement of defective goods), and it **might have** been hypothetically possible that SAIP could have received the benefit of its bargain assuming that Meelunie performed under its warranty and replaced the goods.

But none of that actually happened here, and therefore none of that can be considered the "facts and circumstances of this case." *See* MCL § 440.2719, cmt. 1 ("[W]here an apparently fair and reasonable clause **because of circumstances** fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article"). Simply put, Meelunie's failure to deliver goods renders the limited warranty inapplicable to

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

the facts of this case. The starch was not "defective," it never arrived. Therefore, the limited warranty cannot save the contract from failing of its essential purpose.

Perhaps sensing this to be true, the district court largely ignored Meelunie's warranty argument in its order denying SAIP's post-trial motion. (DE 163). Instead, the district court determined that the "remedy" still available to SAIP after all direct and consequential damages were removed was "the right to cancel its contract with Meelunie and seek goods elsewhere." (*Id.* at pp. 6-7). It is principally on this basis alone that the district court upheld its interpretation of the Terms and Conditions against the weight of the statutory and decisional authority cited above. (*Id.*).

The district court's ruling is fundamentally flawed because the ability to cancel a contract in the face of material breach by the other party ***is a right, not a contractual remedy***. This again is made plain by the Michigan UCC, which defines "termination" as "a power created by agreement or law [which] puts an end to the contract otherwise than for its breach," and then defines "cancellation" as follows:

> "Cancellation" occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of "termination" ***except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance***.

MCL § 440.2106. The right to cancel is but a precursor to a remedy and does not constitute a remedy itself.

The district court was therefore wrong in asserting that the Terms and Conditions did not deprive SAIP of the benefit of its bargain by the mere fact that

SAIP could cancel the Supply Contract upon Meelunie's nonperformance. SAIP is still left without any remedy for Meelunie's breach, which the UCC requires exists at a minimum for a sales contract to be enforceable. *See, e.g.*, 17A Am. Jur. 2d *Contracts* § 603 (cancellation "does not extinguish liabilities that have already accrued under the contract, and this is so [even if] the liability is that … of the party against whom the cancellation is made"); 17B C.J.S. *Contracts* § 448 (1999) ("[T]he exercise of a reserved power of termination will usually have prospective operation only…, ***but will not discharge the duty to make reparation for breaches that have already occurred***.").

Any other interpretation of the Supply Contract would render it illusory. If SAIP's sole recourse is merely cancellation, the contract would be grossly one-sided and give Meelunie license to breach with impunity (which it did here). The "illusory promises doctrine … instructs courts to avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 440 (2015). Any interpretation that entirely relieves one party from any contractual duty to the other is defective under this principle.

Under Michigan law, a contract is illusory if "one party gives as consideration a promise that is so insubstantial as to impose no obligation" because "[t]he insubstantial promise renders the agreement unenforceable." *Decoration Design*

*Sols., Inc. v. Amcor Rigid Plastics USA, Inc.*, 2021 U.S. Dist. LEXIS 239159, at *5-6 (E.D. Mich. Dec. 14, 2021) (citation omitted). A contract that provides a non-breaching party no remedy is illusory, and illusory contracts by definition fail of their essential purpose. *See Latimer*, 386 N.W.2d at 625 ("[T]he remedy prescribed in the limitation of liability clause is an illusory one which represents no remedy at all in that it fails of its essential purpose."); *River Rouge Sch. Dist. v. Mestek, Inc.*, 2002 Mich. App. LEXIS 1231, at *7-8 (Ct. App. Aug. 20, 2002) (holding that the "essential purpose" of a sales contract "is to provide the seller the opportunity to provide the buyer with the substantial benefit of its bargain by supplying goods that conform to the sales agreement"). As stated by Judge Posner, "[t]he UCC disfavors disclaimers that leave the victim of a breach of contract without any remedy." *Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 8 F.3d 607, 611 (7th Cir. 1993) (Posner, J.). That is exactly what the district court's ruling has done to SAIP.

As interpreted by the district court, the Supply Contract requires nothing of Meelunie. Meelunie could have flagrantly refused to deliver any tapioca starch at all to SAIP, for whatever reason it chose (or for no reason at all), and walked away from its contractual obligations unscathed, with SAIP powerless to prevent such willful malfeasance, or to avoid the increased costs and delivery delays resulting from the breach. *See, e.g.*, *Rosenberg v. Lawrence*, 541 So. 2d 1204, 1206 (Fla. 3d DCA 1988) ("Where one party retains to itself the option of fulfilling or declining to fulfill its

obligations under the contract, there is no valid contract…."). The entire purpose of a supply contract is to guarantee a specific quantity of product at a pre-established price so as to limit market risk and timely satisfy downstream demands from the buyer's own customers. If Meelunie could simply refuse to perform, then SAIP has gained no benefit (and in fact is harmed) by entering the contract. Such a contract is illusory, fails of its essential purpose, and deprives SAIP of any benefit derived from it. That being the case, under the Michigan UCC and the applicable case law, the Supply Contract cannot be interpreted to preclude SAIP from recovering its direct damages in the form of cover costs. The district court's post-trial ruling must therefore be reversed.

## <u>CONCLUSION</u>

Based on the foregoing reasoning and authorities, SAIP respectfully requests that this Court reverse the district court's ruling on summary judgment that the Terms and Conditions were incorporated by reference into the Supply Contract and remand the matter with instructions that the Terms and Conditions were not made part of the parties' contract as a matter of law. If, however, this Court affirms the district court's summary judgment on this threshold issue, then SAIP respectfully requests that this Court reverse the district court's final judgment to the extent that it precluded SAIP's ability to seek and recover its direct damages in the form of cover under those Terms and Conditions.

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com

Dated: May 20, 2024

Respectfully submitted,

**MAURO LAW P.A.**

BY: /s/ C. Cory Mauro
C. Cory Mauro
Florida Bar No. 384739
cory@maurolawfirm.com
1001 Yamato Road, Suite 401
Boca Raton, Florida 33431
Telephone: (561) 202-1992
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32.4, this brief contains 12,508 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

BY: /s/ C. Cory Mauro
C. Cory Mauro

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 20th day of May, 2024, a true copy of the foregoing Initial Brief was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by e-mail a notice of docketing activity to the registered Attorney Filer listed on the attached electronic service list.

BY: /s/ C. Cory Mauro
C. Cory Mauro

## ELECTRONIC SERVICE LIST

**JOHN A. HUBBARD, ESQ.**
jhubband@hspplc.com
eparzianello@hspplc.com
**HUBBARD SNITCHLER & PARZIANELLO PLC**
999 Vanderbilt Beach Road, Suite 200
Naples, Florida 34108
*Counsel for Defendant-Appellee*